FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-----------------------------------------------------------------------X
JAMES CURLEY,

                                Petitioner,

     -against-

LINDA CURLEY,

                                Respondent.
-----------------------------------------------------------------------X
LINDA CURLEY,

                                Petitioner,

     -against-

JAMES CURLEY,

                                Respondent.
-----------------------------------------------------------------------X

**DECISION AND ORDER**
Docket Nos. V-2067-06, V-2068-06
V-2188-06, V-2189-06, O-2187-06,
O-2187-06/06A, O-2187-06/06B
Family Unit No. 23006

WARREN, J.

     On July 11, 2006, James Curley filed a petition seeking custody of the children, Courtney Lynn Curley (DOB: 4/7/02) and James Thomas Curley (DOB: 8/2/05). On the same day he filed a family offense petition and was issued a temporary order of protection which directed the respondent, Linda Curley, to abstain from assault, stalking, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats or any criminal offense against James Curley.

     On July 19, 2006, Linda Curley filed a petition seeking custody of the same children. Simultaneously she filed a family offense petition. On that date, she was given a temporary order of protection which directed the respondent to refrain from assault, stalking, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats or any criminal offense against her. It also addressed some sharing of time when the parties would be with their children. Then, on August 25, 2006, Linda Curley filed a petition alleging violations of the

-1-

temporary order of protection and again on October 26, 2006, a second petition was filed by Linda Curley alleging additional violations of this court's temporary order of protection.

It should also be noted that on September 6, 2006, the Child Protective Services Agency filed child neglect petitions against both Linda and James Curley. Those petitions are no longer pending.

A hearing was commenced on December 8, 2006 to determine the issues raised in the custody, family offense and violation petitions. The first witness at the hearing was Dr. Dominic Ferro. On August 18, 2006, this court had designated Dr. Dominic Ferro to conduct a forensic evaluation for the purpose of providing the court with information regarding the issues of custody and visitation of the children. Dr. Dominic Ferro is a medical doctor who graduated from Emory University School of Medicine in 1991. He is certified in psychiatry and forensic psychiatry by the American Board of Psychiatry and Neurology. Beginning in the year 2000, Dr. Ferro served as a forensic mental health psychiatrist for the County of Rockland. As a forensic psychiatrist, he has provided expert testimony in more than 55 cases in 11 jurisdictions. His curriculum vitae shows that he performed more than 500 psychiatric legal evaluations in a broad array of criminal, civil and family court matters. During questioning regarding his background training and experience, Dr. Ferro indicated that he has conducted more than 200 forensic evaluations regarding questions of custody and visitation. He is a member of many professional organizations including the American Association of Psychiatry and the Law, the American Psychiatric Association, and the American Society for Adolescent Psychiatry. Dr. Ferro's forensic evaluation report was introduced into evidence.

It was Dr. Ferro's recommendation that the mother should have custody of the children and the father should have liberal visitation allowing him access to the children for at least a

-2-

brief period each day.    He also stated that both parties should pursue individual psychotherapy.

Dr. Ferro reported that during his interview with James Curley, Linda Curley was described as a very caring and very loving person with the children. He reported that she is a good cook, she reads to the children, she generally keeps them on a good schedule and was responsible for making doctor and dentist appointments. He conceded to Dr. Ferro that Mrs. Curley was more the quarterback of the family than he was. He also noted that during the past six (6) months, Mrs. Curley's behavior had changed.  During a joint interview when both Mr. & Mrs. Curley were present with Dr. Ferro, Mr. Curley portrayed Mrs. Curley as obsessed with work, however, he conceded that not only was she the only one working, but she was also providing more than half of the household maintenance.

In his reasoning, Dr. Ferro notes that the essence of the case is related to the father's concession that the mother was more the quarterback of the family than he was.    He contrasts the mother's ability to work and still quarterback the family with the father's acceptance of a life on disability despite his admitted fitness to work for some years.  Also noted is that during this time of disability, the father has declined the opportunity to care for his children and has agreed, with the mother, that the children spend five (5) days a week from early in the morning until late in the evening in childcare.

Dr. Ferro also found that Mr. Curley was not able to explain to him what he was actually doing with his life.  Mr. Curley had been and remained out of work for many years.  Dr. Ferro noted that one indication that Mrs. Curley was the primary caretaker of the children was that the childcare provider always called her when the children were sick and that she, not Mr. Curley, would take off work to address the children's illnesses.

-3-

Dr. Ferro recommended that the children should be placed in the custody of the mother. He concluded that she was the primary caregiver and primary maintainer of the household. He noted that the father was not working and was "still trying to find his way." However, he did state that because these children were so very young, ideally daily contact with him would be the best way to give them ample time with their father.

During his testimony, Dr. Ferro acknowledged that his opinion is based upon the facts given to him. If those facts are false, it could affect his determination.

James Curley testified that he is forty-two years of age and began his career as a New York City Police Officer where he remained for twenty (20) months. In 1986, he joined the Ramapo Police Department where he is still technically employed. He went out on a line of duty injury in 1990, returned in 1991 and then went out on disability in 1992. After a year and a half, he returned in 1994 part-time and then again went out on disability. He, once again, returned in 1997 for a few months and then was out again in later 1997, returned back in 1998 for a few months and then, once again, was out on disability. He remained on disability as of the time of his testimony.

Mr. Curley was married in 1994 and he and Mrs. Curley have the two (2) children who are the subject of this proceeding. Mr. Curley told the court that Mrs. Curley worked at the Westchester Medical Center until April of 2001 when she went to work at Pascack Valley Hospital. Their first child was born in April of 2002 and Mrs. Curley took off three or four months. During this time Mr. Curley claimed he was helping out with the laundry, cleaning the house, and changing the baby. Mrs. Curley returned to work, three days a week for a 7:00 a.m. to 3:00 p.m. shift. According to Mr. Curley, if the baby would get up at night, he would

get up with the baby.

Mr. Curley stated that for two (2) years, Mrs. Curley stayed on this same shift and then the other four (4) days of the week, each party would care for the child fifty (50%) percent a piece. Then, when the child was two (2), Mrs. Curley went to an 11:00 p.m. to 7:00 a.m. shift until she left in connection with her pregnancy for the baby, James. During the period when she was working 11:00 p.m. to 7:00 a.m., Mr. Curley stated that he cared for the child overnight. He said Mrs. Curley would come home at 8:00 o'clock in the morning, would play with the baby and then go to sleep. Mr. Curley would bring the child to daycare at 9:00 a.m. where the child would stay until 5:00 p.m. He explained the daycare by indicating that during this time he had a back injury and would go to physical rehabilitation two (2) hours a day, three (3) days a week. According to Mr. Curley, both he and Mrs. Curley decided the child should be in daycare five (5) days a week.

James was born on August 2, 2005 and shortly thereafter, Mrs. Curley returned to work at Pascack Valley Hospital. Mr. Curley stated that she worked in both pediatrics and the laser center for two (2) or three (3) months, three (3) days at pediatrics and two (2) to three (3) days at the laser center. Then in December of 2005, she began to work full-time at the skin laser center. During the prior three (3) months, he claimed he was doing all of the household chores and care of the children. Continuing into February of 2006, Mr. Curley stated at this time she began working sixteen (16) to eighteen (18) hours a day, two (2) days a week and twelve (12) hours a day, two (2) to three (3) days a week. During this period, he claims to have been doing sixty (60) to seventy (70%) percent of the caring for the children including the meals, food shopping and purchasing clothing. Mrs. Curley would do nothing for the children during the week.

On June 28, 2006, Mrs. Curley left the home and remained out for five (5) days. Then she returned for two (2) weeks and once again left after legal papers were served upon her. She was then out of the home for four (4) weeks. He believed Mrs. Curley was having an affair. He based this belief on certain pieces of information. From January to June, she would go out saying she would be out for a few minutes and stay out for two (2) to three (3) hours. When he would ask her what she was doing, she would respond by telling him she had errands to do and that she didn't want to disturb him. In late June, he questioned her about making approximately two hundred (200) telephone calls a week, some of which were for eighty (80) or ninety (90) minutes. He claimed she was calling a Dr. Hussein and after being confronted by Mr. Curley, Mrs. Curley reportedly said that she would stop making the calls. Finally, on July 4, he accused her of misconduct since the calls had continued to come in. Mrs. Curley, at that time, reportedly stated that she was having an affair.

Mr. Curley also indicated that Mrs. Curley threatened him by saying that if he would go after Dr. Hussein, she would get his weapon taken away and that the kids would be taken out of the country. He reported that she told him Dr. Hussein is a wealthy man who could get him knocked off. Dr. Hussein has private jets and they would take the children to Pakistan and change their religion.

On Thursday evening, November 30, Mr. Curley received a call from a detective concerning an allegation of child sex abuse against his daughter. He met with the detective and a Child Protective Services worker. Subsequently, he took a private lie detector test and then offered to do one at the Police Department. He told the court that he had been accused of French kissing his daughter and touching her inappropriately. He denied all allegations of sexual abuse.

--6--

During cross examination, Mr. Curley stated that Mrs. Curley had made no effort to see her children for the four (4) weeks after she left the premises in July of 2006. He corrected some of his testimony regarding Mrs. Curley's work situation when he acknowledged that she had worked at the Westchester Medical Center until the child was one year old, not at the Pascack Valley Hospital as he had previously testified.

His plans are to retire as of December 31, 2007 and he was looking to take care of the children thereafter. He noted that over the last twenty (20) years he has actually worked for approximately four (4) or five (5) of those years. He now works out running on a treadmill and strengthening his back. He said that the police surgeon has deemed him fit to return to work, however, the Police Department will not take him back.

He was asked some questions regarding Dr. Ferro's report. He noted that he believed Dr. Ferro was biased toward his wife. Contrary to the information in Dr. Ferro's report, Mr. Curley testified that he has received numerous calls from the daycare program when the kids were sick and he would go to pick them up as necessary.

Anthony Orlando is the Director of Human Resources of the Skin and Laser Center. He was called to testify regarding the medical records of any treatment of Linda Curley. He told the court that no prescriptions for medication were issued for Linda Curley as a patient as part of any medical care provided to her. He indicated that he is an employee of Dr. Goldberg and Linda Curley works for the hospital, not Dr. Goldberg. He also indicated that Dr. Goldberg may issue other prescriptions but that the medical records for Linda Curley as a patient did not indicate that he issued any to her in that relationship.

Betty Vanderbeek has known the parties for fifteen (15) years. She told the court that they used to get together often during the summer and occasionally in the winter. In all the

-7-

times that she has been with Mr. Curley, she has never seen him intoxicated. She told the court that she regularly saw him interacting with the children. She rarely saw Mrs. Curley interacting with the children.

According to Mrs. Vanderbeek on Memorial Day 2006, Mrs. Curley invited her and her husband over for a party. She then proceeded to ignore them. At one point Mrs. Curley left the ten (10) month old child near the deep end of the pool while she was sunbathing. Then she went inside and left the child by the pool and remained away for ten (10) minutes. During the past year, she has been asked to babysit by Mrs. Curley approximately ten (10) times and Mr. Curley once. In prior years she would be asked to babysit more often by each of them.

On August 24, she saw an incident in which Linda Curley was walking aggressively toward James. She observed Mr. Curley put the child, Courtney, down. Mrs. Curley put the child in the car and drove away. Mrs. Curley also stated to Mrs. Vanderbeek that Jimmy would probably not be coming home because he had hit or shoved her.

Since July of 2006, Mrs. Vanderbeek's relationship with Mrs. Curley had deteriorated. Although Mrs. Curley had, apparently, called and made a complaint about Mrs. Vanderbeek not putting the Curley children in car seats, Mrs. Vanderbeek did not acknowledge that this contributed to any of the deterioration in their relationship.

Cathy Genito is Mr. Curley's sister. She has four children, ages 15, 13, 9 and 5. She has observed Mr. Curley play with the children on many occasions, but has not seen much of Linda Curley during this past year. Between January of 2006 and mid-July of 2006, Ms. Genito said that she would see Mr. Curley twice a week at karate with Courtney. Since that time she sees him approximately once every three weeks. She testified that Mr. Curley brings the kids to baseball games and also to their grandmother's house weekly.

-8-

She was asked about Mr. Curley's drinking habits. She acknowledged that he does drink. However, she stated that she has never seen him intoxicated.

Brian Kim is a teacher of Tae Kwon Do. He knows Mr. Curley, whom he met in the Spring. Courtney comes to the program that he operates two to three times a week and on March 18, 2006, she had been signed up for one year. However, she stopped coming on August 14, 2006. Most of the time Courtney would be escorted to the Tae Kwon Do class by Mr. Curley, although Mrs. Curley did bring the child on two or three occasions. There were other occasions when they came together.

Tom Vanderbeek is a neighbor of the Curleys who owns an engineering/surveying company. He lives directly across the street from them and knows them socially for many years. His testimony was that approximately one time a month they would interact socially in 2005. There would always be alcohol served, however, he never saw Mr. Curley intoxicated. Mr. Vanderbeek claims he had a good relationship with both Mr. & Mrs. Curley, although he's had less interaction with Mrs. Curley in 2006. He has babysat for the children on a number of occasions. During his time with the Curleys, he has observed Mr. Curley changing diapers, watching the children in the pool and taking them places.

Stephanie DeBellis operates the Happy Days Childcare facility in Suffern, New York. She is certified in early child development, has an associate's degree from Rockland Community College and her program is licensed by the State of New York. She began operation of Happy Days in April, 2001. She first met Mr. & Mrs. Curley because they are her parents' neighbors. At the time, they had one child, Courtney. Before Courtney was one year of age, she began attending the Happy Days Childcare program. Later on after James was born, he began coming to the program as an infant. She has seen Mrs. Curley on occasions

-9-

when she picks up and drops off her children.

During the months of July and August of 2006, Mrs. Curley would come by during the day to visit with her children. She would call to find out if the kids were there stating that Jim had had the kids and she just wanted to stop by and see them. At one point, Mr. Curley told Ms. DeBellis that Mrs. Curley was not allowed to come to the daycare and that he was taking them out of the center. She indicated that she was going to discharge the children as of December 22. She blamed this on the amount of time that she has had to expend in connection with the Curley situation and that this had affected her business.

Lorraine Matrone is employed by the Happy Days Childcare facility and is also President of the Ramapo Valley Ambulance Corp. She is the Pre-school Assistant Director. She knows both Mr. & Mrs. Curley. She told the court about a time that she presented a plan about feelings and good and bad touches to the children. She told the children that they should never have to feel uncomfortable with a touch. This occurred before Halloween of 2006 and was presented to the three and four year olds in the Happy Days Childcare program. According to Ms. Matrone, Courtney paid rapt attention even though kids usually start to squirm and get restless.

Mary Curley is a vice-president of Provident Bank and was married to James Curley's brother, Tommy, for seventeen years. There were many occasions when she was with Mr. & Mrs. Curley after Courtney was born. About a year to a year and a quarter ago, her contact with the Curleys reduced. She described Linda as a caring, loving mother who took care of the children. When she was with Mr. & Mrs. Curley and the children, she testified that Linda did most all of the things you do for kids including playing with them, feeding them and laying down with them. She has seen Mr. Curley feed the children and play with them.

-10-

In July of 2006, she reestablished her relationship with Linda Curley. She told the court that on one occasion James, Jr. had a bad diaper rash which Linda took care of by bathing the child and putting medication on it. The child was then returned to Mr. Curley and according to Mary Curley when the child was returned by Mr. Curley, the rash was acute again. Once again, Linda took care of it and it improved.

In addition to James Curley being called as a witness on his own behalf, the respondent's attorney called Mr. Curley to testify. During this testimony, Mr. Curley stated that it was early 2005 when he was cleared for return to duty. At this time the return authorized was for light duty such as desk duty. Then, in the summer of 2005, he was cleared to return for full duty. At this point, the childcare arrangements which involved the children being in daycare five days a week, all day long, remained the same.

In 2005, Mr. Curley advised that he went to the Meadowlands twelve to fifteen times and would wager a few thousand dollars. Some testimony was elicited regarding various trips Mr. Curley had taken to Saratoga, New York as well as to Atlantic City. He did not deny going on this type of a trip and indicated that Linda also would go on that type of a trip.

He was asked questions regarding an incident that Mrs. Curley stated occurred on June 15, 2006 at a Best Western Hotel in New Jersey. He absolutely denied ever propositioning a waitress. He further stated that Linda Curley's testimony about him coming home on Sunday mornings and threatening her on a regular basis did not happen. He absolutely denied ever laying a hand on her.

Dr. John McGreal is an attending physician at Valley Hospital. He serves as a full-time emergency room physician in adult and pediatric medicine. He is board certified in internal medicine and pediatrics. He related his involvement with Courtney Curley which occurred on

-11-

November 27, 2006

A pediatrician called him and told him that Mrs. Curley would be arriving with Courtney and gave him some background information. He was told that there was concern from the mother that Courtney had been sexually abused. Courtney and her mother arrived at 10:59 p.m. The examination of the child began at 11:10 p.m.

Dr. McGreal's training has involved receiving general information about ways to talk with children who are injured. He has some training about approaching sexually abused patients. Three times he has interviewed children under ten years of age about sexual abuse. He acknowledged that he is not an expert on children's sex abuse evaluations.

In the situation which occurred on November 27, 2006, Dr. McGreal became concerned about the possibility of the child's father having sexually molested her. The child reported that Daddy kissed her on the mouth with his tongue, that he likes "poopoo" (vagina) and that he touches her with his stick. The mother reported that over the last several months the child had been wetting her bed. She also stated to the doctor that over the last several weeks, the child had put her tongue in the mother's mouth, but that she had thought the child was just being silly. The mother also reported that the husband had physically and sexually assaulted her on several occasions. Dr. McGreal, in the presence of a nurse, interviewed the child. He proceeded to ask her, "Does Daddy kiss you?" The child nodded "yes". He said "Does Daddy put his tongue in your mouth? Does Daddy touch you." The child nodded. "Does Daddy touch you in a private area?" The child nodded. "Does Daddy do anything else you don't want done?", to which the child said "licks me." The Doctor asked "where" and the child pointed to the vaginal area. He asked the child whether Daddy touched her anywhere else and with anything to which he was told "he uses his stick." The Doctor then gestured at his private area

and said "Do you mean a boy's private area" and the child nodded "yes."

The child was given a brief physical exam and the Dr. McGreal noted that the vaginal area appeared slightly larger than normal. He was concerned about a suspicion of sexual abuse and contacted the Town of Ramapo Police Department. He told the mother what the child had told him and had no further contact with the mother. Recently, he had been contacted by the Department of Social Services and asked questions about his examination.

Dr. McGreal acknowledged that this is the only child he has interviewed regarding this type of situation in the last four (4) years. Mrs. Curley had reported to Dr. McGreal that Mr. Curley had sexually molested the child.

It must be noted that during the pendency of the custody proceeding child neglect petitions against both Mr. & Mrs. Curley were pending before this court. During this period of time, the Department of Social Services had been made aware of the potential of a sexual abuse occurrence and as a result conducted an investigation. No charges were filed by the Department of Social Services against Mr. Curley or any other party in connection with the allegations of child sex abuse. The Department of Social Services proceeded to retain an expert in the field of sex abuse evaluation, Dr. Ann Meltzer. On February 10, 2007, Dr. Meltzer issued her report after having interviewed Courtney Curley on three (3) occasions, Linda Curley on two (2) occasions, James Curley on one (1) occasion as well as reviewing additional records. Dr. Meltzer stated in her impressions and recommendation's section of her report that "based upon my interviews with Courtney, her parents and information obtained from several collateral sources of documents, I am unable to state with reasonable degree of professional certainty that Courtney was sexually abused by her father or anyone else." The Department of Social Services has declined to pursue any claim of child abuse or neglect against Mr. Curley

-13-

as a result of their investigation. The parties and the Department of Social Services appeared before the court on Wednesday, February 21, 2007 and at that time the Department of Social Services withdrew child neglect proceedings which had been filed against Mr. & Mrs. Curley. No further action or investigation is being undertaken by the Department of Social Services or, to this court's knowledge, by any other agency or entity with regard to the allegations of child sex abuse.

Linda Curley has a Master's degree in nursing. She was married on August 21, 1994 to Mr. Curley and on April 7, 2002, the first child was born. Mrs. Curley took a maternity leave for four and a half months (4 ½) and thereafter returned to work at Westchester Medical Center for six and a half (6 ½) days out of each month. In 2003, she began to work additional hours by picking up some shifts. Then in April of 2003 she started working at Nyack Hospital on a per diem basis in addition to the Westchester Medical Center employment. In June of 2003, she began working at Pascack Valley part-time. In October of 2003, she went to Pascack Valley where she worked eight (8) hours, three (3) days a week. One year later, she shifted to nights and worked from 11:00 p.m. to 7:00 a.m. three (3) nights per week. At this time, she also worked somewhat at Nyack Hospital. In 2004, she also worked an additional total of five (5) days at Good Samaritan Hospital. Then, in October of 2005, a day position opened and she changed her shift to a daytime arrangement. During this period of time, Mr. Curley was not employed. Mrs. Curley told the court that when she was working nights, she would leave home at 10:15 p.m. and return at 8:00 a.m. and during this period of time, Mr. Curley would be responsible for the care of the child. She did not make any reports of him providing improper care of the child to anyone during that time.

From October of 2004 to October of 2005, this was the time frame during which Mrs.

Curley worked nights. Courtney was in childcare, usually four (4) days a week. Mrs. Curley testified that both she and Mr. Curley would take the child to daycare and pick the child up.

It was in October of 2005 that she went to work for the Laser Surgery Center. Her work was from 8:00 a.m. to 4:00 p.m. Monday to Thursday and, perhaps, one (1) Saturday a month.

Mrs. Curley was asked about having a relationship with a doctor by the name of Hussein, with whom she has contact through employment. She denied having any social relationship with this doctor. However, she said that not all of her conversations with the doctor were business conversations. She was also questioned regarding time records which indicated extensive hours being worked. She explained that she hadn't actually worked all of those hours because some of them are counted as triple time on the records but in fact she worked many fewer hours. She did acknowledge that at some point her employer was upset regarding the volume of overtime hours that she was working. From January 1, 2006 to July 2006, there were many times when she worked more than forty (40) hours and sometimes more than fifty (50) hours. When Mrs. Curley would leave for work at 6:15 in the morning, she would leave the children with Mr. Curley.

Approximately one (1) month before the divorce action began (summer, 2006), Mrs. Curley left the home and stayed one (1) week at Mary Curley's home without the children. When a restraining order was issued against her as a result of her husband filing a petition, she was advised by her attorney to remain out of the house. On July 13, she stayed out of the house and remained out for approximately one (1) month. She testified that during this period of time she tried to see the kids at daycare but that Mr. Curley often didn't bring them to daycare.

During the period July 21, 2006 to October 25, 2006, Mrs. Curley filed eleven (11) police

reports against Mr. Curley. She claimed that she was frightened of Mr. Curley. She testified that his family is a problem, one of his brothers is a bar owner, another has had problems with steroids and gambling and alcohol, a third is a heavy alcoholic and has been convicted of a sex crime as a minor. She had no negative statement to make regarding Mr. Curley's mother.

Mrs. Curley testified that on June 15, 2006, Mr. Curley threw a phone and struck her on the shoulder. He threatened to kill her at which time she said she would call 911 and he proceeded to leave.

On August 14, 2006, an incident occurred during which Mr. Curley grabbed Mrs. Curley to prevent her from leaving with the children. She said that he squeezed her arms tight. Mr. Curley left the home with Courtney and Mrs. Curley left the home with James. Mrs. Curley said to the child not to be afraid of Daddy, that the child could come with her.

Mrs. Curley was questioned with regard to the percentage of care that she provided to the children and that which Mr. Curley provided. According to Mrs. Curley during the first year of Courtney's life, Mrs. Curley provided one hundred (100%) percent of the care and Mr. Curley, zero. Over the next year, Mrs. Curley provided ninety (90%) percent of the care and Mr. Curley, ten (10%) percent and then continuing thereafter, Mrs. Curley provided seventy-five (75%) percent of the care and Mr. Curley, twenty-five (25%) percent. With regard to James, Mrs. Curley contends that she has provided seventy-five (75%) percent and Mr. Curley twenty-five (25%) percent.

Mrs. Curley was questioned regarding a family offense petition she filed which claimed that weekly since before the marriage, on Sunday mornings between 2:30 and 4:00 a.m., Mr. Curley would return home threaten and intimidate her, screaming at her face within inches with his fist clenched demanding anal intercourse. Mrs. Curley told the court that this was a regular

-16-

occurrence which went on for years. Although Mr. Curley did not strike her, this was very frightening to Mrs. Curley. Mrs. Curley told the court that Mary Curley had witnessed Mr. Curley intoxicated on occasions. She also related the incident where in the middle of November, her daughter, Courtney, started kissing her on the mouth and putting her tongue in her mouth. She said this was the behavior that led to contacting a pediatrician and thereafter bringing the child to Dr. McGrea.

During examination she was asked regarding Mrs. Vanderbeek's testimony. She said that Mrs. Vanderbeek was wrong with a lot of things. She told the court that the Vanderbeeks were not close friends with them, that they came over uninvited, maybe ten (10) times a year. Betty Vanderbeek was not her friend, was an okay person, but very irritating. Mrs. Curley said she does not have many friends.

She testified that if she was given custody her mother may move up here from Alabama and move in with her or she would utilize daycare for the children. She told the court that her mother had seen the children on one (1) occasion over the last fifteen (15) months. She also indicated that she believed Mr. Curley had molested the child. She said that she would be very vigilant with the children, would not want overnights and would want someone there with the children during visitation. According to Mrs. Curley, it would not be good for Mr. Curley to have the children with him instead of them being in daycare.    This testimony occurred before the results of the Child Protective Services' investigation was reported.

Mrs. Curley has alleged that she has been followed by someone by the name of Pat Daly, a bad alcoholic who lives at the bar and that Mr. Curley's sister, Kathy, has followed her. She also testified that she believes her car was being electronically monitored by Mr. Curley.

Some records were examined regarding text messages sent to and from Mrs. Curley.

According to her, these messages were work related. There were forty (40) to fifty (50) text messages on May 21 alone.

Mrs. Curley earned $40,000 in 2005 from Pascack Valley Hospital and another $5,000 from Nyack Hospital. In 2006, she earned $78,000 as of the date of the hearing. She explained that she earned more because she was able to work double shifts and thereby moving to a category of earning triple time. She said Mr. Curley encouraged her to make triple time until the summer and then she could take time off.

Linda Curley believes that James Curley has a drinking problem. She said that he would go out three (3) or more nights a week, Thursday, Friday, Saturday, Sunday, Monday would be typical nights for him to go out. On the contrary, she always came directly home from work except when she had to pick up groceries or food at a fast food restaurant. She complained that frequently Mr. Curley would leave the children with others and go out at night.

Accordingly to Linda Curley, when Mr. Curley would come home, he would often be drunk, would be abusive sexually, would be yelling and would demand anal sex.

Before the concern about the sexual molestation of Courtney arose, Mrs. Curley was willing to provide every other weekend visitation to Mr. Curley, as well as visitation two (2) to three (3) times per week. She was also prepared to accept a joint custodial arrangement with him so long as she had the right to make any final decision.

She testified that it was her responsibility to take the kids to the pediatrician. James has asthma and has been given a nebulizer and also medication. Mr. Curley never took the children to physicians until the divorce began. Prior to the divorce it was only Mrs. Curley who took Courtney to the dentist. Things have changed since the divorce and Mr. Curley has also done so now.

Mrs. Curley's preference is to remain in the home with the children. If she is not able to do so, she would like to remain in the area within thirty (30) minutes from where she now resides.

The question arose regarding the daycare arrangements for the children. Courtney entered Happy Days Childcare when she was nine (9) months of age. Apparently both parents wanted the child in daycare. After James was born, Mrs. Curley was out of work for about six (6) weeks and thereafter both parents decided to enroll James at eight (8) weeks of age, full-time in daycare. During this time Mrs. Curley was working four (4) days a week and Mr. Curley was not employed.

Mrs. Curley told the court that she has certain drugs prescribed for her which include imitrex for migraines and feurecet also for migraines. In addition she has birth control pills which were most recently refilled in July. Certain records from CVS Pharmacy were examined and they indicate prescriptions for tramidol in September of 2006 and again in October of 2006. Mrs. Curley would have prescriptions provided through Dr. Goldberg's office, apparently not as a patient, but as what the court would describe as a "courtesy" because of the employment arrangement.

A pivotal question in custody determinations is that of the best interests of the children *Tropea v. Tropea*, 87 NY2d 727. In determining what is in the best interests of the child, there are no absolutes; rather there are a series of policies designed, not to bind the courts, but to guide them in determining what is in the best interests of the child. *Eschbach v. Eschbach*, 56 NY2 167, *Friederwitzer v. Friederwitzer*, 55 NY2d 89. It is the totality of the circumstances which the court must evaluate in determining the question of the children's best interest. *Muller v. Muller*, 221 AD2 635. It is the trial court which is given the weighty responsibility of

evaluating the various factors to be considered as it is that court which is in the best position to evaluate the testimony, character and sincerity of the parties.

Neither party has any *prima facie* right to custody. Domestic Relations Law §240. The sole criterion upon which the determination is to be made is the best interests of the child. *Fountain v. Fountain*, 83 AD2d 694, *Dornbush v. Dornbush*, 110 AD2d 808, Appeal Dismissed. 66 NY2d 1024.

Case law reflects a clear preference in the courts to award custody to the parent who has been the primary caretaker for the children, whether that be the mother or the father. *Laura A. K. v. Timothy M.*, 204 AD2d 325, *Lobo v. Muttee*, 196 AD2d 585, *Synakowski v. Synakowski*, 191 AD2d 836.

A number of factors are to be considered in determining the fitness of the parents. Fitness is a proper subject to examine as it relates to which parent can better serve the child's best interests. A number of these factors were present in this case.

A parent's disability may be relevant factor to consider. *Janus v. Janus*, 239 AD2d 712. Each parent's credibility, their behaviors, lifestyle, financial status and personal associations are all relevant factors to consider. *Church v. Church*, 238 AD2d 677, *Wallinger v. Wallinger*, 96 AD2d 988, *McIntosh v. McIntosh*, 87 AD2d 968.

A parent's addition to alcohol or drugs may be considered by the court as it seeks to determine the fitness of the parent to provide for children. *Matter of F.*, 76 Misc2d 617. A parent's association with third parties can be relevant on the question of his or her fitness. *Kelly v. Kelly*, 58 AD2d 884.

Statutorily courts are required to give serious attention to the issue of domestic violence. Domestic Relations Law §240 provides that if such allegations are proven by a preponderance

of the evidence, a court is required to consider the effect of such domestic violence upon the best interests of the child.

The parent's financial status is a factor to consider. *Wallinger v. Wallinger*, 96 AD2d 998. However, with the advent of the Child Support Standards Act, the ability of courts to provide for child support to the custodial parent significantly minimizes the impact of the financial status factor.

A child's gender has often been a factor to consider in determining custody. The tendency has been to try to assure that the child has the advantage of the guidance that can be best provided by a parent who has experienced the same developmental issues which that child will experience.

Expert opinions regarding the question of custody of children should not be lightly disregarded by the trial court. *Rentschler v. Rentschler*, 204 AD2 60, *Matter of Rebecca B.*, 204 AD2d 57. The Second Department has held that those opinions are, at least, entitled to some weight, unless contradicted by the record. *Young v. Young*, 212 AD2 114, *Muller v. Muller*, 221 AD2d 635. However, judges are not bound by such opinions.

It has long been held that a court should consider which parent would be more likely to provide access to the other parent. *Entwistle v. Entwistle*, 61 AD2d 380, Appeal Dismissed 44 NY2d 851. In fact, it has been stated that interference in the relationship between a parent and a child is so inconsistent with the best interests of a child as to raise a serious question about the interfering parent's fitness to be the custodial parent. *Barbato v. Barbato*, 264 AD2d 792.

In addition to the factors which this court has just listed, there are other factors utilized by the courts in making custody determinations. Some include stability for the children, their wishes, separation of siblings, and the mental health of the parties. However, those and others

-21-

not listed are not factors which are present in this case to any significant degree. Therefore, the court will confine itself to the previously listed factors in arriving at its determination.

To begin, the court must note that it is responsible for assessing the credibility of the parties' testimony. Many of the contentions made in this case were unsupported by the evidence. This has raised serious questions about the credibility of the parties.

The question of who has been the primary caretaker of these children is a critical one. Dr. Ferro concluded that Mrs. Curley provided that function even though she was regularly employed while Mr. Curley was not. The court had great difficulty understanding why these two young children, one from the age of eight (8) weeks, would spend all day long in the care of daycare providers while their father who now seeks custody of them was apparently content to allow them to remain in childcare even though he was not working and had no significant obligations, except, perhaps, some physical therapy appointments. The court questions his commitment to these children when he now professes to love them so dearly while for years he chose to not see them from early morning until late in the afternoon five (5) days a week while he was clearly available to be with them. This hardly appears to be the behavior of a person who purports to be the primary caretaker of the children.

Linda Curley apparently agreed to a five (5) day per week childcare arrangement. Although she was working, there were a number of days when she was not, yet the children remained in childcare. There was a time when she was working only three (3) days a week, yet the children stayed five (5) days a week in childcare. Each party framed their testimony to present themselves as the primary caretaker of the children. Neither was completely credible to the court.

It is the court's conclusion and finding that Linda Curley has served as the primary

caretaker of these children. While Mrs. Curley could surely have taken the children out of childcare on the days she wasn't working and she could have chosen to work fewer days during certain periods of her employment, at least she was working for a substantial portion of the time the children were in childcare. She, therefore, had some justification for daycare for the children.

On the contrary, the court views Mr. Curley's choice to have the children in full-time daycare even though he was not working, was out on disability although he was not unable to perform daily functions, as almost an abandonment of the children and surely an indication that he was not anxious to spend a great deal of time with them. To the court, this is a telling and critical factor. It buttresses the court's conclusion that Linda Curley has been the primary caretaker.

Mr. Curley has been disabled for a significant percentage of his adult life. He has been back and forth with disability occurring, ending, and reoccurring for almost twenty (20) years. He now claims he is fit and has been cleared for a return to work. His employer will not allow him to return so he plans on retiring in the near future. No medical testimony was presented regarding Mr. Curley's disabling condition and the potential for its reoccurrence.

Mrs. Curley has no history of being disabled. Her record includes a serious auto accident from many years ago, but thereafter a return to work, often working many hours, bearing two (2) children, and continuing to work thereafter. The court was not made aware of any disabling conditions she has had other than a temporary one in connection with an auto accident.

In attempting to predict which parent is more likely to be able to provide hands on care for these young children and not become disabled, the court has examined the parties history.

-23-

Given Mr. Curley's extensive history of disability, it would appear that it is more likely that Mrs. Curley rather than Mr. Curley would remain healthy and disability-free as these children grow.

Many claims were made by these parties during the course of the hearings. Mrs. Curley claimed that Mr. Curley was a habitual drinker and an excessive gambler. She said his family was comprised of very disreputable characters. She claimed he regularly abused her verbally. She said he coerced her into sexual situations she was uncomfortable with. She said she believed he sexually molested their daughter. She denied having anything but a business relationship with a doctor even though she acknowledged extensive non-business hours conversations and text messages with him. She claimed that Mr. Curley had her under surveillance with people following her and/or the use of a tracking device. Although Mr. Curley was admittedly given some significant responsibility for the care of the children when Mrs. Curley worked overnight, she had no complaints about his care until the parties became embroiled in a custody battle. Since the commencement of the custody proceedings, she has filed eleven (11) police reports against Mr. Curley as contrasted to having filed none before the commencement of the proceeding.

None of Mrs. Curley's claims were able to be corroborated by other evidence. Some were directly cast in doubt by the testimony of independent parties or other evidence. The totality of the testimony and other evidence left the court with serious doubts about the credibility of Linda Curley.

But neither was Mr. Curley completely credible. He claimed that he had the children in daycare for five (5) days per week because he went to doctors' appointments and physical therapy. The court found this reason for these very young children to be in the care of a daycare provider for an entire week, eight (8) or nine (9) hours per day, as not a credible one.

-24-

The court believes that Mr. Curley had the children in care for years not because of extensive appointments but because he, and Mrs. Curley, chose to place them there rather than care for them. While Mr. Curley claimed he was doing up to sixty (60%) or seventy (70%) of the childcare, he told Dr. Ferro that Mrs. Curley was "the quarterback" of the family. His trial testimony seemed to be conveniently tailored yet contradictory to what he told Dr. Ferro. He claimed to be threatened by Mrs. Curley through her statement about Dr. Hussein having him "knocked off" and "taking the children to Pakistan," claims for which there was little support.

Each parent's lifestyle and behaviors were vigorously attacked by the other. However, it is important to note that there were apparently no public expressions of complaint by either party until the dam burst with the commencement of the matrimonial and these proceedings. In these proceedings, Mr. Curley was portrayed as a drinker, gambler, abuser and sexual deviant. Mrs. Curley was portrayed as an adulteress, workaholic who was not significantly involved with her children. Mr. Curley's family was identified as unfit and Mrs. Curley's as unavailable.

Very little of the unfitness allegations were proven to this court's satisfaction. Each party attempted to present the worst possible picture of the other even though for more than ten (10) years, they apparently lived together in a somewhat harmonious relationship. Out of all of those claims, this court found little that was helpful in determining what was in the children's best interest.

The parties respective financial status is not an issue. Each party is clearly financially capable of supporting these children. An appropriate award of child support to the custodial parent will assure that whatever party has custody, the children will be adequately provided for.

Claims of domestic violence were made by Mr. Curley and Mrs. Curley. Neither party

-25-

was able to convince the court that they had established the existence of any domestic violence by a preponderance of the evidence. Therefore, domestic violence is not a factor for the court to utilize in making its determination.

Courtney is about five (5) years of age. At this age, it is not necessarily critical that as a young girl she be raised by her mother. This may be a factor to be considered as she gets older. Similarly for James, a much younger child, at some point the need for more contact with a father may become important. Today, the court finds that the parents' respective genders are non-factors.

Dr. Ferro's opinion has been given some weight by the court. Although there is much that can be said about the truthfulness of the parties, nonetheless Dr. Ferro's opinion was based primarily on his determination that the mother had been the primary caretaker. The court concurred with that factual conclusion.

Dr. Ferro's assessment of the parties was consistent with the court's impression. He stated that according to Mr. Curley, Mrs. Curley has been working too much, but she still provided a substantial portion of the care for these children. In fact, Mr. Curley described her as the quarterback, a term generally denoted to be the leader or focal point of the team.

In contrast, Mr. Curley had no real explanation for why he had essentially spent the majority of his life waiting for something to happen. He has accepted a life on disability for many years and, significantly has even declined the opportunity to care for his children, instead choosing to have them in care for up to nine (9) hours per day, five (5) days a week.

Finally, this court must give consideration to the question of which parent will be more likely to provide regular and meaningful access to the children for the other parent. During this period of strife the court believes that neither party has been completely willing to provide the

type of open access which works in the children's best interest. Of obvious concern to the court were the allegations of child sex abuse raised shortly before trial and ultimately not substantiated through Child Protective Services' investigation, nor through court testimony. While of some concern, nonetheless the court is unable to conclude by a preponderance of the evidence that Mrs. Curley fabricated these matters for the purpose of denying Mr. Curley custody or contact with his children. While this may be the case, there was insufficient evidence for the court to establish that conclusion by a preponderance of the evidence. Therefore, the court is not able to conclude that either party is more or less likely to provide or deny access to the children.

After considering all of the factors set forth in this decision, it is the finding of the court that it is in the best interests of the children to be placed in the legal custody of the respondent/petitioner Linda Curley. She has been the primary caretaker of these children and there is nothing in the record to indicate that she has provided less than competent care of them. Joint custody between these parties is not feasible at this point in their severely, fractured relationship.

Mr. Curley should have regular and substantial contact with his children. Dr. Ferro suggested the possibility of daily contact. Although in an ideal world, with cooperating parents, daily contact could be wonderful for the children. However, where the parties are severely at odds, daily contact is not advisable because it involves too much interaction between the parents. Therefore, the court is directing that Mr. Curley have visitation with the children every other weekend from 6:00 p.m. Friday evening until 6:00 p.m. Sunday evening and that he have additional visitation with them every Tuesday and Thursday evenings from 4:00 p.m. to 7:00 p.m. The parties are to exchange the children at the Suffern Village Police Station until July

-27-

1 2007. On that date and continuing thereafter, they shall be picked up by Mr. Curley from Mrs. Curley's home and returned by him to her home at the conclusion of the visitation. In the event that Mrs. Curley relocates beyond five (5) miles from the Village of Suffern Police Station, this issue can be revisited.

At present the parties are operating on a split schedule with the children being with Mrs. Curley and staying in the home from Tuesday at 5:00 p.m. until Saturday at 7:00 p.m. Mr. Curley has the children and he is in the home from Saturday at 7:00 p.m. until Tuesday at 5:00 p.m. In order to effect a smooth transition to the arrangement provided by this order, the court directs that the parties continue under the terms of the present order until Friday, March 23, at which time the children will be with Mrs. Curley. Friday, March 23 will be Mr. Curley's first (1st) alternate weekend of visitation and all terms of this order shall govern the parties time with the children thereafter.

Mr. Curley should have visitation on holidays, school vacation periods and for a period of at least two (2) weeks in the summer. The parties and counsel should attempt to arrive at an agreement regarding the specifics for this visitation. If they can reach such an agreement within thirty (30) days, they can submit a consented to order for the court to sign. If they are unable to do so, either party may petition for the relief they are seeking.

In addition, Mr. Curley should have access to medical, dental and mental health providers, school personnel, daycare personnel, and any other individuals or organizations providing for their children. The right of access given Mr. Curley by this direction gives him the right to learn of and obtain records about his children from the various providers. It does not give him decision making authority.

The following petitions are dismissed for failure to establish their allegations by a

preponderance of the evidence; O-2187-06/06A, O-2187-06/06B, O-2187-06.

By notice of motion dated January 19, 2007, Linda Curley has sought attorney's fees in the sum of Forty-two thousand six hundred eighty seven ($42,687.00) dollars and Three thousand ($3,000.00) dollars for the sum paid by her to Dr. Dominic Ferro for his trial appearance. The application is supported by the affirmation of Eric Ole Thorsen, affirmed the 19th of January, 2007 and the affidavit of Linda Curley sworn to the 18th of January, 2007. The application is opposed by the affidavit of James Curley sworn to the 26th day of January, 2007 and the affirmation of Paul Goldhamer affirmed the 25th day of January, 2007.

Upon consideration of the moving papers and opposition this court, in its discretion, denies the application except that the respondent shall pay to the petitioner the sum of Fifteen hundred ($1500.00) dollars as his share of the cost of Dr. Ferro's trial appearance.

Each party has expended substantial funds or has obligated themselves to do so in connection with the proceedings held before this court. They are simultaneously embroiled in a matrimonial dispute where their respective financial circumstances are an issue before Justice Margaret Garvey. This court did not find that the positions taken by either party were without fault. Each party has substantial income. Under these circumstances each party should bear their own counsel fees for the Family Court proceedings.

Dr. Ferro's testimony was necessary as part of the custody hearing. It would be unjust to require the party who is favored by the doctor's testimony to bear the full cost since the doctor was a court appointed neutral evaluator and since the court expressly reserved the right to re-allocate his fee in the event a hearing was necessary. Therefore, respondent shall pay to petitioner one-half of Dr. Ferro's fee to testify, which fee was Three thousand ($3,000) dollars. Said Fifteen hundred ($1,500) dollar amount shall be paid within sixty (60) days from

the date of the decision and order and respondent shall file proof with this court within the aforesaid sixty (60) day period that the sum has been so paid. If he fails to do so, petitioner may seek enforcement and counsel fees necessary to accomplish enforcement.

The foregoing is the decision and order of the court.

ENTER

Dated: New City, N.Y.
      March 2, 2007

HON. WILLIAM P. WARREN, J.F.C.

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF THE COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

TO:  ERIC OLE THORSEN, ESQ.
     Attorney for Linda Curley
     5 South Little Tor Road
     New City, New York 10956

     PAUL GOLDHAMER, ESQ.
     KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.
     Attorneys for James Curley
     747 Chestnut Ridge Road
     Chestnut Ridge, New York 10977

     CHRISTOPHER T. WIDHOLM, ESQ.
     Law Guardian
     2 Congers Road
     New City, New York 10956

DATE: 8/16/07

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE COPY OF THE ORIGINAL ON FILE IN THE ROCKLAND COUNTY FAMILY COURT.

CLERK OF THE COURT